Masti, C. J.
 

 The bill is filed to rescind a contract. It states that the testator, Mr. Singletary, who was the- owner of a slave by the name of Guilford, to whom he was much attached, and being about to remove out of the county of Beaufort, where he then resided, “ agreed with said slave, to convey him to any person whom the said slave should select, who would agree to pay said Singletary, a certain sum in annual payments, for a certain time, out of the profits of the labor of the said slave ; and after the expiration of that time, to permit the said slave to go at -large, and act as a free-man, and who should, nominally only, be his master. This arrangementwas considered by the said Singletary as an act of bounty to the said slave, and the object was to emancipate him, &c., and still leave him to reside in the State.” The bill states that a contract was made between plaintiff’s testator and the defend
 
 *274
 
 ant, to cany out this intention. Hoyt gave to the testator liis bonds for the stipulated price, to wit: $850, divided into five annual payments, and the latter conveyed the slave to the former by a deed, absolute on its face.
 

 The answer denies that the contract was such as is set forth in the bill, but claims Guilford by án absolutepurchase. The answer, however, contains statements which strongly corroborate the allegations in the bill, and are inconsistent with any other. The enquiry is, does the bill state such a case as au-thorises the inteference of a Court of Equity? Wo think it does not. The object of the testator was a benevolent one; but the mode resorted to, is contrary to the well-known policy of the State. There are three -ways in which slaves can be emancipated, viz ; by the judgment of a Court of record, Rev. Stat. ch. 111, sec. 57; or by tlie owner taking, or sending them out of this, to a free State ; or by the Legislature. . In neither of the two first cases can the slaves remain 'in the State, and only by a legislative act can that
 
 privilége be
 
 obtained. It is in direct violation of the policy of the State, to suffer a slave, upon his emancipation, to remain in the State ; and this Court, in various cases, have declared that secret trusts, such as the bill -sets forth, are null and void. See
 
 Thompson
 
 v. Newlin, 3 Ire. Eq. 338;
 
 Huckaby
 
 v.
 
 Jones,
 
 2 Hawks 120;
 
 Stevens
 
 v.
 
 Ely, 1 Dev.
 
 Eq. 493;
 
 Lemmond
 
 v. Peoples, 6 Ire. Eq. 137. These cases .establish the general principle, that a secret trust for the emancipation of a slave, whether by voluntary deed or will, is void, and a trust results in the latter case to the next of kin of the testator, and in the others, to the grantors. Those cases, however, do not control this; in each of them the conveyance v'as a voluntary donation. Here, it is a conveyance upon a full and valuable consideration, to wit, $850, for a slave forty-five years old. Huckaby’s case was under a will, in which the Court say,, the legatees
 
 to
 
 whom the property was willed, were trustees only, and the purpose of the trust, the emancipation of the slaves. This was an illegal trust, as the slaves were to remain in
 
 the
 
 State, and the legacy, a mere donation. In Ely’s case the conveyance of the
 
 *275
 
 slaves was a donation, two slaves being conveyed for £5. The trust was expressed upon tlie face of the deed, and for a
 
 quasi
 
 emancipation. The trust in the case of Peoples also arose under a voluntary conveyance for the same secret purpose. Tiie-error of the parties consisted in not attending to the difference between a secret trust, of the nature we are discussing, accompanying a Aroluntary conveyance where the trustee has no interest in the slaves conveyed, and one where the conveyance is for a valuable consideration, conferring an interest in the trustee. In the latter case, where the object and purpose is to secure to the slave, what is termed a
 
 quasi
 
 emancipation, the parties are
 
 in pari
 
 delicto, and Equity stands neuter between them; it being a maxim of equity,
 
 in pari
 
 delicto,
 
 potior est conditio defmdentis.
 
 Equity will lend its aid, neither to enforce, nor to cancel, the contract, but'leave the parties to contest their legal rights, if any they have, in a Court of Law. It is a maxim of law,
 
 ex turpi causa non oritur
 
 actio; if, therefore, a contract be made, so tainted, while it remains executory, Equity will not interfere where its invalidity appears upon its face; because a Court of law is competent to take notice of it; but if its invalidity does not so appear, it will give relief. But the Court will not interfere to rescind, where the contract is executed, by reason of the maxim
 
 in pari
 
 delicto, &c. Here, the contract ivas executed ; the -testator had conveyed the slave Guilford to the defendant, Hoyt, who took possession of him and executed his bonds for the price agreed on. This rule, however, does not apply to contracts made in violation of a statute to protect the citizen from oppression, and the oppressed party is asking relief, as in the case of usury; for, in such a case, though the complainant has joined in violating the law, he is not considered
 
 in pari delicto.
 
 Adams’ Eq. 349; 2 Story’s Eq. sec. 700; 1 Story’s Eq. sec. 298.
 

 A contract made in violation of the public policy is considered a constructive fraud, as not originating in any actual or positive evil design. 1 Story 258. It is not intended to cast upon the parties the slightest charge of any moral delinquent
 
 *276
 
 cy. The vendor here was actuated by a pure and benevolent motive; he resorted to a mode not sanctioned by the law. In the language of Judge Henderson in Ely’s case, “ the act is foi'bidden only by the stern policy of the State, necessary to support our institutions in regard to slaves; but there is nothing
 
 malum in se
 
 in the act.”
 

 The Court cannot grant the relief asked, and the bill is dismissed.
 

 Per Curiam. Decree accordingly.